UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

BOBBY J. NICHOLS,                    )
                                     )
                PLAINTIFF,           )
                                     )
vs.                                  )        CASE NO. 07-CV-630-FHM
                                     )
MICHAEL J. ASTRUE,                   )
Commissioner of the                  )
Social Security Administration,      )
                                     )
                DEFENDANT.           )

## OPINION AND ORDER

Plaintiff, Bobby J. Nichols, seeks judicial review of a decision of the Commissioner of the Social Security Administration denying Social Security disability benefits.[1] In accordance with 28 U.S.C. § 636(c)(1) & (3) the parties have consented to proceed before a United States Magistrate Judge.

The role of the Court in reviewing the decision of the Commissioner under 42 U.S.C. §405(g) is limited to determining whether the decision is supported by substantial evidence and whether the decision contains a sufficient basis to determine that the Commissioner has applied the correct legal standards. *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Doyal v. Barnhart*, 331 F.3d 758 (10th Cir.

---

[1] Plaintiff's November 9, 2004 applications for Disability Insurance and Supplemental Security Income benefits were denied initially and upon reconsideration. A hearing before an Administrative Law Judge (ALJ) was held January 17, 2007. By decision dated April 9, 2007, the ALJ entered the findings which are the subject of this appeal. The Appeals Council denied review of the findings of the ALJ on September 9, 2007. The action of the Appeals Council represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481.

2003).  The Court may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *See Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. *White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2002).

Plaintiff was 46  years old at the time of the hearing. [R. 280].  He claims to have been unable to work since December 24, 2003, due to pain and stiffness in his neck and shoulders, numbness and tingling in his hands, headaches, sleep disturbances and drowsiness caused by medications. [R. 283-293]. The ALJ determined that Plaintiff has severe impairments consisting of herniated disc at C5-6; spondylosis at C5-6 and C6-7;[2] and status post arthroscopy[3] of both shoulders. [R. 18].  The ALJ found Plaintiff was disabled within the meaning of the Social Security Act from December 24, 2003 through January 1, 2007, but that medical improvement related to Plaintiff's ability to work occurred and that Plaintiff has been able to perform substantial gainful activity from January 2, 2007 through the date of his decision. [R. 14-15].  He concluded, therefore, that Plaintiff was entitled to a "closed period" of benefits. *See Shepherd v. Apfel*, 184 F.3d 1196, 1199 (10th Cir. 1999) ("closed period" is when new applicant for disability benefits is determined to be disabled for a finite period of time which started and

---

[2]  Spondylosis is degenerative spinal changes due to osteoarthritis. *See* Dorlands' Ill. Med. Dictionary, 31st ed. (2007) 1780.

[3]  Arthroscopy is a method of viewing a joint, and, if needed, to perform surgery on a joint. An arthroscope consists of a tiny tube, a lens, and a light source. The device is inserted into a small incision and allows a surgeon to look for joint damage or disease. The device also allows the surgeon to perform reconstructive procedures on the joint, if needed. *See* medical definitions online: http://www.nlm.nih.gov/medlineplus/ency/article/003418.htm

stopped prior to the date of the decision) (citing *Pickett v. Bowen*, 833 F.2d 288, 289 n.1 (11th Cir. 1987).

Plaintiff asserts the following allegations of error: 1) the ALJ failed to demonstrate how or why Plaintiff had medically improved to the point that he was no longer disabled and could perform a reduced range of sedentary work after January 1, 2007; 2) the ALJ failed at step 5 of the determination because he did not include all of the limitations that his own evaluators found present in his hypothetical to the VE and in his RFC; 3) the ALJ failed to properly evaluate and weigh the opinion of the treating physician who determined Plaintiff did not have the RFC to work on a full time basis; and 4) the ALJ failed to perform a proper credibility determination. [Dkt. 15].  For the following reasons, the Court finds this case must be reversed and remanded to the Commissioner for reconsideration.

## Medical Improvement

Once a claimant has been found to be disabled, a presumption of continuing disability arises in his favor and the Commissioner bears the burden of producing evidence sufficient to rebut this presumption of continuing disability. *See* 20 C.F.R. § 404.1594(f)(1) through (8) (setting out eight-step process in terminating benefits); *see also Hayden v. Barnhart*, 374 F.3d 986, 991 (10th Cir. 2004) (citing *Glenn v. Shalala*, 21 F.3d 983, 987 (10th Cir. 1994) (citing regulations).  Nevertheless, a claimant whose condition has improved medically so that he is able to engage in substantial gainful activity may no longer be disabled. *Id.*  Medical improvement is any decrease in the medical severity of a claimant's impairment(s) which was present at the time of the most recent favorable medical decision that  the claimant was disabled or continued to be

3

disabled. 20 C.F.R. § 404.1594(b)(1); *Shepherd*, 183 F.3d at 1199 (discussing standards for evaluating medical improvement in a closed period case). A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with the claimant's impairment(s). *Id.* To apply the medical improvement test, the ALJ must first compare the medical severity of the current impairment(s) to the severity of the impairment(s) present at the time of the most recent favorable medical decision finding the claimant disabled. *Id.* Then, in order to determine that medical improvement is related to ability to work, the ALJ must re-assess the claimant's RFC based on the current severity of the impairment(s) which was present at his last favorable medical decision. 20 C.F.R. § 404.1594 (c)(2). The ALJ must then compare the new RFC with the RFC before the putative medical improvement. The ALJ may find medical improvement related to an ability to do work only if an increase in the current RFC is based on objective medical evidence. *Id.* This medical improvement standard applies in the instant case.

## Plaintiff's Medical History

Medical Treatment records from Plaintiff's general care physician indicate Plaintiff complained of arm, wrist and hand problems in December 2003. [R. 194]. Carpal tunnel syndrome was suspected.[4] [R. 192-193].

---

[4] Carpal tunnel syndrome is caused by pressure on the median nerve at the point where it passes through the wrist. The median nerve supplies sensation to the thumb side of the palm, and to the thumb, index finger, middle finger, and the thumb side of the ring finger. It also helps with movement to part of the hand. See medical definitions online at: http://www.nlm.nih.gov/medlineplus/ency/article/000433.htm

4

Plaintiff was examined and evaluated on February 20, 2004, by Richard A. Hastings, II., D.O.. [R. 144-151].  Dr. Hastings reviewed Plaintiff's medical records and conducted range of motion (ROM) testing of both shoulders, both knees, both elbows and both wrists and he took grip measurements of both hands.  *Id.*  He found positive Tinel's sign and Phalen's test.[5] [R. 149].  Dr. Hastings reported that Plaintiff had sustained an on-the-job injury due to repetitive cumulative trauma to the right and left shoulders, right and left knees, right and left elbow and bilateral hands and wrists. [R. 150].  He opined Plaintiff was temporarily totally disabled from January 31, 2004 through the date of his report.  *Id.*  He recommended examination by a hand specialist. [R. 151].

David K. Wong, M.D., an orthopedic specialist, saw Plaintiff on June 3, 2004, for the purpose of evaluating the hands, wrists and arms. [R. 168-169].  Dr. Wong noted Plaintiff was to be seen by Dr. Dukes for his shoulders and knees.  Physical examination revealed a general positive examination involving both upper extremities but the pain level seemed "somewhat exaggerated."  X-rays of the hands and elbows revealed minimal degenerative changes.  Dr. Wong recommended Plaintiff try an elbow sleeve as well as a wrist brace.  He placed him on oral anti-inflammatories and ordered a "nerve test."  *Id.*

Sri K. Reddy, M.D., conducted EMG and nerve conduction velocity studies on June 30, 2004. [R. 152-154].  He found no evidence of median nerve entrapment at the

---

[5]  Tapping over the median nerve at the wrist may cause pain to shoot from the wrist to the hand. This is called the Tinel's sign. Bending the wrist forward all the way for 60 seconds will usually result in numbness, tingling, or weakness. This is called the Phalen's test. See medical definitions online at: http://www.nlm.nih.gov/medlineplus/ency/article/000433.htm

wrist or elbow on either side and no findings to suggest C5/C6/C7/C8 radiculopathy on either the right or the left." *Id.*

On July 15, 2004, Dr. Wong reviewed the negative nerve tests but reported that Plaintiff "does appear to have some carpal tunnel symptoms and I am going to give him a carpal tunnel injection today." [R. 167].  He repeated his impression that Plaintiff's symptoms seemed "rather exaggerated" with no localized symptoms and advised Plaintiff that if he did not respond to treatment, "he may just simply have to live with the pain that he has." *Id.*

Plaintiff underwent physical therapy involving the wrists and elbows from June 14, 2004 to August 16, 2004, at the direction of Dr. Wong. [R. 155-164, 170].  Upon release from treatment, the therapist reported Plaintiff had made minimal improvement and "self limits secondary to pain and fear of increasing pain." [R. 155].

On August 17, 2004, Dr. Wong voiced his belief that "there may be some carpal tunnel syndrome." [R. 165].  However, Plaintiff had not responded to any conservative care  and, in light of the negative nerve test, he advised Plaintiff there was not a strong enough indication to warrant operative treatment but that, if his symptoms worsened and became more clearly treatable, surgery may be indicated in the future.  He opined that, in terms of Plaintiff's upper extremity problems save for the shoulders, he had reached the point of maximum medical benefit. *Id.*

As mentioned by Dr. Wong, Plaintiff had separate treatment for complaints involving his shoulders by Kevin M. Dukes, M.D., at the Tulsa Bone & Joint center.  Dr. Dukes' first treatment note, dated July 6, 2004, indicates Plaintiff had "fairly marked guarding of both shoulders, with decreased range of motion which appeared to be

6

related predominantly to pain." [R. 246].   Dr. Dukes recommended obtaining an MRI

of the left shoulder. *Id.*  At the July 28, 2004, follow-up appointment, Dr. Dukes noted

some small amount, but no significant improvement with the injection. [R. 246].  Plaintiff

told Dr. Dukes "he was supposed to have surgery for his wrist and elbow by Dr. Wong

despite some normal EMG nerve conduction studies." *Id.*  Dr. Dukes said:

> At this point this certainly still seems to be a very cloudy
> picture.  He certainly by MRI has an AC arthropathy, which
> he is tender over the AC joint and has some tendinopathy of
> his supraspinatus; however, I think before we discuss any
> possibility of shoulder surgery we need to rule out any neck
> pathology because certainly the shoulder does not explain
> the numbness he is having into his wrist and hand region as
> well.

[R. 245].  Dr. Dukes ordered an MRI of the neck which he reviewed on September 9,

2004. The MRI demonstrated "a fairly significant disk at C5-6 as well as C6-7 with some

foraminal stenosis." *Id.*  He recommended Plaintiff see Dr. Rick Thomas for evaluation

of the neck. *Id.*

Plaintiff was seen by Dr. Thomas on October 25, 2004. [R. 243-244].  Plaintiff

had limited flexion/extension, some mild paraspinous spasm as well as trapezial spasm

bilaterally.  The MRI of the cervical spine revealed a right C5-6 disk bulge that creates

mild to moderate foraminal stenosis and broadbased disk bulge at C6-7 that also

creates mild foraminal stenosis.[6]  It was unclear what percentage of Plaintiff's pain was

coming from his shoulders versus his neck.  Dr. Thomas prescribed Lortab[7] for pain,

---

[6] The cervical vertebrae make up the neck.  Stenosis is narrowing in the spine, putting pressure on nerves and spinal cord. See medical definitions online at: http://www.nlm.nih.gov/medlineplus/.html

[7] Lortab (hydrocodone bitartrate and acetaminophen) is a semisynthetic narcotic analgesic and antitussive indicated for relief of moderate to moderately severe pain. *Physicians' Desk Reference* (continued...)

Flexeril[8] for spasms, an epidural steroid injection and a muscle stimulator. He recommended diskograms[9] if Plaintiff had good temporary relief from the cervical injection. [R. 243].

Plaintiff complained of back and neck pain to his general care physician on November 15, 2004. [R. 190-191]. Low back pain with spasm, cervical spine pain with radiculopathy[10] symptoms, decreased grip, diffuse complaints of joint pain and bilateral carpal tunnel symptoms were assessed on March 7, 2005 and Plaintiff was noted to be wearing a neck brace. [R. 186-187].

Beau C. Jennings, D.O., reported to the Social Security Administration on March 16, 2005, that Plaintiff would not allow ROM testing of his shoulders because of pain. [R. 171-172, 173-174]. Plaintiff had good grip and pinch strength and deep tendon reflexes, touched fingers to thumbs, manipulated small objects well; there were no Heberden's nodes,[11] and no clubbing, joint redness or swelling. His heel-toe gait was normal and all ranges of motion of the lower extremities were full. Dr. Jennings

---

[7] (...continued)
(PDR) 53rd ed. 3162.

[8] Flexeril is a muscle relaxant, *Physician's Desk Reference*, 51st ed. (1997) 1592, 1701.

[9] Discography is an invasive procedure involving putting needles into the disc and is used to determine a specific cause of pain when abnormalities are demonstrated by MRI. *See* medical definitions online at: http://www.spine.org/Documents/discography_2006.pdf (link provided at: http://vsearch.nlm.nih.gov/vivisimo/cgi-bin/query-meta?v%3Aproject=medlineplus&query=discogram)

[10] Radiculopathy refers to any disease affecting the spinal nerve roots. A herniated disk is one cause of radiculopathy (sciatica). See medical definitions online at: http://www.nlm.nih.gov/medlineplus/ency/article/000442.htm

[11] Hererden's nodes are small, bony knobs appearing on the end joints (those closest to the nails) of the fingers. See medical definitions online at: http://www.niams.nih.gov/Health_Info/Osteoarthritis/default.asp

assessed chronic neck pain, chronic bilateral shoulder pain and chronic bilateral carpal tunnel syndrome.

Continued neck, wrist and hand pain complaints and wrist splints were noted by Plaintiff's general care physician on May 11, 2005. [R. 184-185]. Lumbosacral spasm, decreased bilateral range of motion and increased pain was reported on June 2, 2005. [R. 182-183].

Dr. Dukes saw Plaintiff on July 27, 2005. [R. 242].   Plaintiff had continued complaints of pain in both shoulders and elbows and was wearing wrist supports.  He had good range of motion and no evidence of instability or crepitation.  The MRI demonstrated a posterior labral tear along with an acromioclavicular joint arthropathy (joint disease) and findings consistent with impingement.  Dr. Dukes opined Plaintiff was unable to work and recommended surgery. *Id.*

Dr. Thomas saw Plaintiff in follow-up for his neck complaints on August 10, 2005. [241-242].  He noted Dr. Dukes' findings of significant shoulder pathology that required operative intervention.   Physical examination revealed limited right and left lateral rotation of the cervical spine.  Dr. Thomas observed that Plaintiff holds his head in a forward and flexed fashion with 4+/5 strength in bilateral upper and lower extremities secondary to pain.  He recommended intense physical therapy for the cervical spine to help pull him back into a more normal posture and steroid injection.  He also opined Plaintiff was temporarily totally disabled. *Id.*

Dr. Thomas re-examined Plaintiff's neck on September 7, 2005, and commented that it was imperative Plaintiff's shoulder and carpal tunnel problems be addressed before considering any additional treatment for his neck. [R. 239-241].

In response to a workers' compensation adjuster's call inquiring about the delay of Plaintiff's surgery on October 5, 2005, Dr. Dukes noted he had not been aware Plaintiff had been approved for surgery. [R. 238-239].  Because of the length of time since Plaintiff was last seen, Dr. Dukes re-examined Plaintiff and ordered another MRI. *Id.*

The next treatment notation appearing in the record is by Dr. Dukes, dated March 1, 2006. [R. 237].  Plaintiff still described disabling pain in his shoulders and neck region.   Dr. Dukes reported that both Plaintiff's shoulders demonstrated positive impingement signs, that he had a very long and frank discussion with Plaintiff regarding surgery and his reluctance to perform the surgery because of Plaintiff's overall pain syndrome.  He also noted that Plaintiff's abnormality of the shoulder could potentially be correctable by surgery. *Id.*

 On March 30, 2006, left shoulder arthroscopic repair of superior labrium anterior and posterior lesion, subacromial decompression and distal clavicle excision was performed by Dr. Dukes. [R. 231, 237].  Dr. Dukes examined Plaintiff on April 10, 2006, and physical therapy was started. [R. 236].

Dr. Thomas also examined Plaintiff on April 10, 2006. [R. 235-236].  He stated nothing could be done for the neck until after full recovery of the shoulder which he estimated would take between 8 and 12 weeks. [R. 236].

Dr. Dukes expressed concern on May 8, 2006, that Plaintiff was not progressing quite as well as he needed to. [R. 235].  Physical therapy was continued.  Dr. Dukes delayed surgery on the right shoulder until Plaintiff's left side improved.  He noted Plaintiff was not capable of returning to work. *Id.*

On May 22, 2006, Dr. Thomas reported Plaintiff was "rehabing" his left shoulder after having surgery by Dr. Dukes and that Plaintiff was "making some strides now, however it has been rather slow." [R. 234-235].   Dr. Thomas noted that Plaintiff continued to complain of neck pain.  Plaintiff had good range of motion of his cervical spine with some crepitation.  He was non tender in the mid line; motor and sensory findings were grossly normal.  Dr. Thomas recommended continuing to work on the cervical spine with physical therapy and prescribed Mobic.[12]  He said: "After he is released with his shoulder we will begin to address his neck, repeat the MRI of the cervical spine." [R. 234].

Dr. Dukes saw Plaintiff on June 28, 2006. [R. 253].  Plaintiff reported his left shoulder was "doing great" and that he was pleased with his progress.  Attention was directed to Plaintiff's right shoulder and an MRI was ordered. *Id.*

Dr. Thomas reported Plaintiff continued to have pain in his neck that radiated out to his shoulders on July 7, 2006. [R. 252].  Plaintiff had been attending physical therapy for his shoulder, "but has noted a decrease in the tension to his cervical spine." Plaintiff's motor and sensory exam was normal.  His cervical spine range of motion was within normal limits.  Dr. Thomas recommended continuing cervical physical therapy. *Id.*

On September 11, 2006, Dr. Thomas found no change in Plaintiff's condition, noting that physical therapy was helping, "in fact cervical traction helps to get rid of his

---

[12]  Mobic is a non-steroidal anti-inflammatory (NSAID) used for the treatment of the signs and symptoms of osteoarthritis and rheumatoid arthritis. Physicians' Desk Reference (PDR) online at: 2008 PDR 0860-0200 (database updated August 2008).

headaches, although he continues to have intermittent head aches." [R. 251].  He said: "At this point I will let Doctor Dukes continue with his shoulder.  I will be happy to see him back after he has been released from any treatment with his shoulder." *Id.*

Dr. Dukes also saw Plaintiff on September 11, 2006. [R. 250].  He reported Plaintiff's left shoulder was doing well.  He reviewed the right shoulder MRI results which demonstrated a significant AC arthropathy with some impingement inferiorly and significant tendinopathy of the supraspinatus.  He discussed proceeding with surgery on the right shoulder. *Id.*

Right shoulder arthroscopy with subacromial decompression, debridement of labral tear and partial undersurface rotator cuff tear and distal clavicle excision was performed on October 3, 2006. [R. 247-248].

An October 18, 2006 follow-up note by Dr. Dukes indicates Plaintiff was seen that date for the first postoperative check of right shoulder arthroscopy and subacromial decompression. [R. 249].  Dr. Dukes wrote: "I am going to start him in physical therapy and see him back in four weeks." *Id.*

The last notation appearing in the record from Dr. Dukes is dated December 11, 2006. [R. 254].  Dr. Dukes reported Plaintiff was "still having just a mild amount of discomfort and decreased range of motion and mild weakness."  Otherwise, his examination was unremarkable.  Dr. Dukes ordered three more weeks of therapy after which he planned to "see him back, at which time he will have reached his maximum medical improvement and we will discharge him." [R. 254].

Dr. Thomas wrote the following letter "To Whom It May Concern" on December 18, 2006 [R. 255]:

12

[Plaintiff] is status post shoulder arthroscopy bilaterally.  He is unable to reach overhead and experiences pain if he extends his arms to shoulder height.  Because of his shoulder pain, he should not lift or carry more than 10 pounds using both hands.  He has reduced range of motion in his shoulders, along with pain and weakness.

[Plaintiff] is left hand dominant and is unable manipulate small objects or grasp a hammer with that hand.  He is unable to use his left hand effectively to perform his daily activities.  He is unable to lift 5 pounds with his left hand.

His neck complaints are supported by an MRI, which revealed a herniated disc at C5-6 and spondylosis at C5-6 and C6-7.  He has restricted range of motion and pain with turning his head to the right or left and with flexion and extension of his neck.  He holds his head in a forward fashion to alleviate pain.  The pain radiates down between his shoulder blades into his low back, and down his arms into his fingers, resulting in numbness and tingling in his hands, along with reduced grip strength.  He also suffers from muscle spasms, headaches, and swelling, and uses a soft collar for cervical support.  He has diminished strength in the bilateral upper and lower extremities secondary to postural and pain reasons.

[Plaintiff] is limited to sitting no more than 20-30 minutes at a time, and standing or walking no more than 15-20 minutes at a time without needing to alternate positions because of stiffness and pain.  He has to recline frequently throughout the day to relieve his pain.  He would not be able to work a full 8-hour workday without having to rest several times during the day for approximately 1-2 hours.

[R. 255].

## The ALJ's Decision

The ALJ acknowledged the applicable regulations and the standard for determining whether medical improvement had occurred and whether that medical improvement was related to Plaintiff's ability to work. [R. 15-17].  He found Plaintiff met

the insured status requirements of the Social Security Act and that Plaintiff had not

engaged in substantial gainful activity since December 24, 2003. [R. 18].

In his third finding of fact, the ALJ said:

> At all times relevant to this decision, the claimant has had the following severe impairments: herniated disc at C5-6; spondylosis at C5-6 and C6-7; and status post arthroscopy of both shoulders.

[R. 18].  The ALJ cited the report by Dr. Wong and Dr. Thomas' 5/5 strength findings

on September 11, 2006, as support for concluding Plaintiff's alleged carpal tunnel

syndrome is mild and would have only a minimal effect on his ability to perform work-

related activities. [R. 18].  He found Plaintiff's impairments did not meet or equal one

of the impairments listed in 20 C.F.R., Pt. 404, Subpt. P., Appendix I (Listings). [R. 20].

The ALJ assessed the following RFC for the time period between December 24,

2003 through January 1, 2007:

> [T]he claimant had the residual functional capacity to perform less than a full range of sedentary work activity significantly compromised by his inability to do sustained work-related physical and/or mental activities in a work setting on a regular and continuing basis.  A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule (Social Security Ruling 96-8p).

[R. 18].

As to Plaintiff's RFC beginning January 2, 2007, the ALJ wrote:

> [T]he claimant has had the residual functional capacity to occasionally lift and/or carry 10 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for at least 2 hours out of an 8-hour workday; sit for at least 6 hours out of an 8-hour

14

workday (with normal breaks); with no working above shoulder level.

[R. 21].  He cited Dr. Dukes' June 28, 2006 and December 11, 2006 progress notes as support for his determination that medical improvement had occurred and Plaintiff's disability ended on January 2, 2007. [R. 20].

With regard to Dr. Thomas' December 18, 2006 letter, the ALJ pointed to progress notes from Dr. Dukes and Dr. Thomas as conflicting evidence and declined to give it controlling weight. [R. 23-24].

The ALJ stated he did not discount all Plaintiff's complaints but that Plaintiff's treating physicians did not place any functional restrictions on his activities that would preclude sedentary work activity with the previously mentioned restrictions and that Plaintiff's restricted daily activities were self imposed. [R. 24].

### Discussion

Plaintiff contends the ALJ failed to cite objective medical evidence that substantiated any improvement after January 1, 2007. [Dkt. 15, p. 2].   The Commissioner responds that the ALJ made a reasonable inference from Dr. Dukes' post-surgical progress notes that Plaintiff's "conditions" had medically improved. [Dkt. 19, p. 2].  Plaintiff replies that the records do not constitute substantial evidence to support the ALJ's determination. [Dkt. 22].   Implicit in Plaintiff's argument is the contention that the ALJ's RFC findings are not supported by substantial evidence.  After review of the record, the ALJ's decision and the parties' briefs, the Court concludes the ALJ failed to make specific RFC findings, that he failed to develop a substantial basis for his RFC determination and that this case must be reversed for those reasons.  See

15

*Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996) (ALJ must make specific RFC findings); *also See Haddock v. Apfel*, 196 F.3d 1084, 1088 (10th Cir. 1999) (RFC findings must be supported by substantial evidence).

At step two, the ALJ found Plaintiff had severe impairments of his cervical spine (neck). [R. 18].   He also found Plaintiff had a severe impairment relating to the shoulders. *Id.*   He did not, however, describe what functional limitations those impairments imposed upon Plaintiff's RFC as of December 24, 2003, the date he determined Plaintiff's disability commenced.  His RFC finding for the closed period was simply a conclusory determination that Plaintiff was able to perform less than a full range of sedentary work activity significantly compromised by an inability to do sustained work related physical and/or mental activities in a work setting on a regular and continuing basis. [R. 18].  He did not explain how or why Plaintiff's neck and/or shoulder impairments caused Plaintiff's disability and he did not adequately describe Plaintiff's functional capabilities in his RFC determination. *See Howard v. Barnhart*, 379 F.3d 945 (10th Cir. 2004) (ALJs must provide express analysis for RFC findings); *see also* Soc.Sec.Ruling (SSR) 96-8p, 1996 WL 374184, at *3-4 (RFC represents the most that an individual can do despite his or her limitations or restrictions).

The RFC as set forth by the ALJ for the period after January 2, 2007, is equally deficient.  The ALJ concluded Plaintiff could perform sedentary work activities with an additional restriction against working above shoulder level. [R. 21].  This indicates that the ALJ concluded Plaintiff had some functional limitation even after the shoulder surgeries.  The ALJ stated later in his decision that sedentary work would allow Plaintiff to remain seated for most of the work day "which should take the strain off his neck and

16

shoulders and reasonably accommodate his limitations." [R. 24].  However, the ALJ never identified the cause of Plaintiff's inability to remain seated for most of the work day during the closed period and he did not explain how the shoulder surgeries eliminated that restriction. He did not say whether any of the restrictions were to accommodate Plaintiff's shoulder impairment, neck impairment or some combination of the two. *See* SSR 96-8p at *5 (in determining RFC, the ALJ is required to consider the effect of all claimant's medically determinable impairments, both severe and not severe).  Nor did he explain why Plaintiff was still unable to return to her past work, which was performed at the light exertional level, even after her condition medically improved.

Because the RFC for the closed period was inadequate, there was no basis for comparing it with the new RFC when the ALJ determined Plaintiff's disability ended. *See* 20 C.F.R. §§ 404.1594(b)(7) (Commissioner must compare the current medical severity of impairment(s) present at time of most recent favorable medical decision to the medical severity of that impairment at that time).   And, because the ALJ did not reveal the extent of medical improvement Plaintiff experienced in 2007 or the resultant impact such improvement had upon Plaintiff's ability to perform work activities, his new RFC lacked sufficient information to support termination of Plaintiff's period of disability.

In his decision, the ALJ discussed Dr. Dukes' treatment notes of June 28, 2006 and December 11, 2006, and based his finding of medical improvement upon those post-surgery notes. [R. 20].  Although he did not say so, the ALJ apparently relied upon Dr. Dukes' post surgery notes as the basis for his new RFC assessment.  While the notes do provide substantial evidence to support the ALJ's conclusion that there was

17

medical improvement related to Plaintiff's shoulders, they do not specify the degree of improvement and they do not address Plaintiff's cervical spine impairment.  The ALJ also discussed Dr. Thomas' December 18, 2006 letter and offered reasons for not giving Dr. Thomas' opinions regarding Plaintiff's functional limitations controlling weight. [R. 23-24].  However, he did not determine whether Plaintiff had experienced medical improvement with regard to his neck impairment.  Nor did he explain what limitations on work activities were caused by the neck impairment either during or after the closed period.

There is no suggestion anywhere in the record that the severity of Plaintiff's cervical spine impairment was reduced by the arthroscopic surgery on Plaintiff's shoulders.  Indeed, Dr. Thomas, who was Plaintiff's treating physician for his cervical spine problems, opined that Plaintiff had continuing severe limitations involving his neck and cervical spine even after the surgeries.  The ALJ referred to Dr. Thomas' findings of good range of motion in the neck in his April and May 2006 treatment notes and the EMG study in 2004 as evidence that contradicted Dr. Thomas' opinion.  However, the ALJ did not mention that Dr. Thomas often reported good range of motion during the same examinations that he noted pain, muscle spasm and posture problems.  Dr. Thomas found flexion and extension limitations caused by the herniated disc and spondylosis in Plaintiff's cervical spine throughout the treatment period and his clinical findings were consistent with MRI scans.  Nor did the ALJ acknowledge that Dr. Thomas had kept Plaintiff in physical therapy for his cervical spine complaints while Plaintiff was undergoing surgery and post-surgery rehabilitation on his shoulders or that

18

Dr. Thomas planned to "address" Plaintiff's neck after he had been released by Dr. Dukes.

Because the ALJ did not make specific RFC findings for the closed period, there was no basis for comparison between it and the RFC on the supposed date that Plaintiff's impairments medically improved to the extent that he could engage in work activities.  Furthermore, because it is unclear whether Plaintiff's shoulder impairments were the sole basis for the December 24, 2003 RFC findings, the evidence showing medical improvement of Plaintiff's shoulders does not provide substantial evidence to support the January 2, 2007 RFC or the ALJ's conclusion that the medical improvement allowed Plaintiff to engage in substantial gainful activity on a sustained basis after that date.

Upon remand, the Commissioner should assess the nature and extent of Plaintiff's physical limitations and then determine Plaintiff's RFC for the closed period based upon his ability to perform physical demands of work activity, such as sitting, standing, walking and lifting. *See* SSR 96-8p, 1996 WL 374174, at *2 (The RFC assessment must be based on **all** of the relevant evidence in the case record, such as: medical history; medical signs and laboratory findings; the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication); ... recorded observations; medical source statements; effects of symptoms.... *Id.* at *5 (emphasis in original).  In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe."  *Id*, at *3-4.  Then, if the Commissioner proceeds to a determination of

19

whether Plaintiff's disability continues or ends, he must apply the legal principles for such an evaluation as provided in 20 C.F.R. §§ 1594, et seq.

### Conclusion

The ALJ failed to demonstrate that he performed the correct analysis under 20 C.F.R. § 404.1594. *See Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) ("Failure to apply the correct legal standard or to provide [the] court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal."); *Byron v. Heckler,* 742 F.2d 1232, 1235 (10th Cir.1984) (quotation omitted).  The decision of the Commissioner is, therefore,   REVERSED and REMANDED for further development and reconsideration in accordance with this Opinion and Order.

Dated this 4th day of February, 2009.

Frank H. McCarthy

FRANK H. McCARTHY
UNITED STATES MAGISTRATE JUDGE